**SINGH, SINGH & TRAUBEN, LLP**
**THOMAS K. RICHARDS** (SBN: 310209)
  trichards@singhtraubenlaw.com
**MICHAEL A. TRAUBEN** (SBN: 277557)
  mtrauben@singhtraubenlaw.com
400 S. Beverly Drive, Suite 240
Beverly Hills, California 90212
Tel: 310.856.9705 | Fax: 888.734.3555

*Attorneys for Plaintiffs*
WINDWARD LOOP, LLC, MIKE TEREPKA,
DREAM HAMPTON, SEAN CARASSO,
SKYLINE CAPITAL PARTNERS, LLC
*and* ERIK HUBERMAN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WINDWARD LOOP, LLC, a California limited liability company, MIKE TEREPKA, an individual, DREAM HAMPTON, an individual, SEAN CARASSO, an individual, SKYLINE CAPITAL PARTNERS, LLC, a Delaware limited liability company, and ERIK HUBERMAN, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOT KINNEY SEEDS, a California corporation, ABBOT KINNEY SEEDS, LLC, a California limited liability company, WEST INDIES TRADING CO., INC., a California corporation, KRISTIAN VALLAS, an individual, and DOES 1 through 25, Inclusive, <br><br> Defendants. | **Case No.: 2:19-cv-9354** <br><br> **COMPLAINT FOR FOR:** <br><br> 1. **Securities Fraud (Securities Exchange Act of 1934, § 10(b));** <br> 2. **Securities Fraud (Violation of California Corporation Code § 25501.5 – Unlicensed Broker-Dealer);** <br> 3. **Fraud in the Inducement;** <br> 4. **Fraud;** <br> 5. **Breach of Fiduciary Duty;** <br> 6. **Breach of Agreement;** *and for an* <br> 7. **Accounting** <br><br> **DEMAND FOR JURY TRIAL** |

Singh,
Singh &
Trauben,
LLP

Plaintiffs DREAM HAMPTON ("Hampton"), SKYLINE CAPITAL PARTNERS, LLC ("Skyline"), ERIK HUBERMAN ("Huberman"), WINDWARD LOOP, LLC ("Windward Loop"), MIKE TEREPKA ("Terepka"), SEAN CARASSO ("Carasso"), and (collectively "Plaintiffs"), by and through their undersigned counsel, hereby sue Defendants ABBOT KINNEY SEEDS, a California Corporation ("A.K.S. Corp."), ABBOT KINNEY SEEDS, LLC ("A.K.S. LLC"), WEST INDIES TRADING CO., INC. ("West Indies Trading"), KRISTIAN VALLAS ("Vallas") and DOES 1 through 25 (collectively, "Defendants"), and allege as follows:

## NATURE OF ACTION

1.      This lawsuit arises out of Defendants' fraudulent scheme to induce Plaintiffs to invest $500,000 (the "Investment") in exchange for an illusory ownership interest in a bar and restaurant and equally illusory "common stock" in Defendant A.K.S. Corp.

2.      Defendants, through Vallas, represented to Plaintiffs that A.K.S. Corp. was the sole owner and operator of a bar, lounge and restaurant named *Neighbor* located at 1031 Abbot Kinney Blvd, Venice, CA 90291 (the "Business") and that in exchange for the Investment, Plaintiffs would be granted stock in A.K.S. Corp. thereby securing an ownership interest in the Business and entitling them to all the benefits that would flow from possessing such an ownership interest, including, but not limited to, any profit distributions from the Business.

3.      Defendants' representations to the Plaintiffs that by owning stock in A.K.S. Corp. they would thereby own part of the Business were false.

4.      In fact, the Business was owned and operated through a totally different company, West Indies Trading. West Indies Trading appears to be solely owned and controlled by Vallas – its statements of information list him as serving as its CEO, Secretary, CFO and even as registered agent. The full role of West Indies Trading in the Business was never disclosed to Plaintiffs. Plaintiffs were never provided any stock, or

Singh, Singh & Trauben, LLP

any opportunity to acquire any stock, in West Indies Trading.

5.     Moreover, Defendants, without any disclosure or notice to Plaintiffs, converted A.K.S. Corp. to A.K.S. LLC, a limited liability company, in January 2017 (the "Conversion") without complying with any of the requirements as set forth in the California Corporations Code, such as: (i) providing a conversion plan to all of the shareholders of A.K.S. Corp.; (ii) obtaining the approval of the shareholders of A.K.S. Corp. of the Conversion; (iii) providing an operating agreement to the Plaintiffs for A.K.S. LLC; and (iv) converting Plaintiff's common stock in A.K.S. Corp. to membership interests in A.K.S. LLC.

6.     Defendants had already induced Hampton and Skyline to invest in the Business prior to the Conversion, and their purported shares of common stock in A.K.S. Corp. were never converted to membership interests in A.K.S. LLC and nor were they ever presented with, or offered the opportunity to review and execute, the operating agreement for A.K.S. LLC.

7.     Even after the Conversion, Defendants continued to sell "common stock" in A.K.S. Corp., despite the fact that A.K.S. Corp. no longer existed as a corporation and had already been converted to A.K.S. LLC, a limited liability company.

8.     Moreover, after the Conversion, Defendants shockingly continued to sell "common stock" in A.K.S. Corp., using contracts in the name of A.K.S. Corp., to each of Plaintiffs Huberman, Windward Loop, Terepka and Carasso.

9.     Defendants made these "sales" to Huberman, Windward Loop, Terepka and Carasso, and accepted and converted their Investments, despite the fact that there was no "common stock" in A.K.S. Corp. to sell, as A.K.S. Corp no longer existed as a corporation with shares of stock.

10.     This fraudulent conversion scheme also harmed Hampton and Skyline, as the "common stock" they held was in an entity that no longer existed, and that "common stock" was never converted to a membership interest in A.K.S. LLC.

11.     All told, Vallas collected $500,000 from the Plaintiffs, while giving

Singh,
Singh &
Trauben,
LLP

Plaintiffs no actual ownership interest in the Business (or anything of value) in exchange.

12.     The end result of Vallas' scheme is that Vallas appears to run the Business through his solely owned alter ego shell entity West Indies Trading and used this undisclosed structure to unlawfully commander the entire benefit of the Plaintiffs' Investment and any returns from the Business solely for himself. Vallas never provided Plaintiffs with any securities or other bona fide ownership interest in the Business in exchange for the Investment and, consequently, has never paid Plaintiffs the return on their Investment to which they are entitled.

13.     This scheme constitutes securities fraud, common law fraud and further constitutes breaches of fiduciary duties, breaches of contract, violations of the California Corporations Code, and other legal wrongdoing.

14.     To date, despite the Business generating sales of over $6 Million since it opened in August 2017 (the "Opening") though April 2019 (and probably even greater sales since), Defendants have only caused a single disbursement of revenue in the amount of $50,000 to be split amongst all of the Plaintiffs.

15.     To date, Defendants have never provided Plaintiffs with stock certificates or other securities in A.K.S. Corp., have never affirmatively disclosed to Plaintiffs that A.K.S. Corp. was converted to A.K.S. LLC, never converted any stock in A.K.S. Corp. to membership interests in A.K.S. LLC and have never made, or even offered to make, Plaintiffs parties to the operating agreement for A.K.S. LLC.

16.     To date, Defendants have never disclosed the true role of West Indies Trading or Vallas personally in the Business or disclosed what funds, revenues and profits flow to West Indies Trading and Vallas in connection with the Business.

17.     To date, Defendants have never provided complete and accurate accountings for the Business, or the required annual reports for the Business.

18.     In further violation of the law and Defendants' duties owed to Plaintiffs, including Defendants' duties to allow Plaintiffs to inspect the books and records of the

Singh,
Singh &
Trauben,
LLP

Business, Defendants also ignored Plaintiffs' written demands properly made under the California Corporations Code for an inspection of the books and records of the Business.

19.     Defendants have further failed to make annual reports in compliance with the California Corporations Code.

20.     Consequently, Plaintiffs are entitled to reimbursement of their Investment and/or any revenues and profits they should have received along with other damages.

21.     Further, as Vallas and his alter ego companies cannot be entrusted to continue to operate the Business and account to Plaintiffs, the nature of this ongoing fraud compels the remedy of a receivership. A receiver should be appointed by the Court to operate the Business and account to Plaintiffs. Plaintiffs maintain clear ownership and property rights in the Business and its revenues, and without a receiver, there is a clear and present danger of Plaintiffs' ownership rights, property and funds being lost, destroyed or misappropriated and, in fact, Plaintiffs' rights and property are currently and on an ongoing basis being lost, destroyed and misappropriated.

## **THE PARTIES**

22.     Plaintiff Hampton is an individual residing in Detroit, Michigan.

23.     Plaintiff Skyline is Delaware company authorized to conduct business in the State of California.

24.     Plaintiff Huberman is an individual residing in Los Angeles County, California.

25.     Plaintiff Windward Loop is a California limited liability company.

26.     Plaintiff Terepka is an individual residing in Multnomah County, Oregon.

27.     Plaintiff Carasso is an individual residing in Travis County, Texas.

28.     Upon information and belief, Defendant A.K.S. Corp. was organized and existed under the laws of the State of California as a corporation until it was converted to a limited liability company.

29.     Upon information and belief, Defendant A.K.S. LLC is a California limited liability company organized and existing under the laws of the State of California which

Singh,
Singh &
Trauben,
LLP

was created by being converted from A.K.S. Corp.

30.     Upon information and belief, Defendant West Indies Trading is a California corporation organized and existing under the laws of the State of California.

31.     Upon information and belief, Defendant Vallas is an individual residing in Los Angeles County, California.

32.     Upon information and belief, on or around January 30, 2017, A.K.S. Corp. was converted to A.K.S. LLC, specifically through the filing of a conversion document with the California Secretary of State. A.K.S. Corp., A.K.S. LLC and West Indies Trading are, when referred to collectively, hereinafter referred to as the "Company Defendants".

33.     In addition, Plaintiffs are informed and believe, and on that basis allege, that Defendant Vallas is the alter ego of the Company Defendants and that there exists, and at all times mentioned herein existed, a unity of interest and ownership between Vallas and the Company Defendants such that any individuality and separateness between these Defendants have ceased and Vallas controls and/or controlled the business and activities of the Company Defendants.

34.     Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned, the Company Defendants were and are mere shells, instrumentalies and conduits through which Vallas carries on his business in the corporate name, exactly as he would have had there been no corporate entities at all, exercising complete control and dominance over such businesses to the point where any individuality or separateness between Vallas and the Company Defendants does not, and at all times herein mentioned, did not, exist.

35.     Plaintiffs are informed and believe that the Company Defendants do not observe the requisite corporate formalities.

36.     In addition, upon information and belief, Vallas further comingled and continues to comingle his assets with the Company Defendants, controlled and continues to control the Company Defendants' finances in their entirety, treated and treats the

Singh,
Singh &
Trauben,
LLP

Company Defendants' assets as his own, uses assets and funds from the Company Defendants to pay his own debts and liabilities, and further engages in such zealous controlling conduct towards the Company Defendants that the Company Defendants were and remain nothing more than mere instrumentalities of Defendant Vallas.

37.   Upon information and belief, the Company Defendants are and were extremely undercapitalized as all, or most, of the revenues and monies yielded from the Company Defendants' business were and have been drained from the Company Defendants and transferred to Defendant Vallas personally and for Vallas' personal use and, further, Vallas has and continues to use the assets of the Company Defendants for his own personal use and has wrongfully diverted from their intended use significant sums of money properly owed and to be paid to Plaintiffs.

38.   Plaintiffs are informed and believe, and on that basis allege, that the Company Defendants are unable to satisfy any judgment against them.

39.   Adherence to the fiction of the separate existence of Vallas as an individual separate and distinct from the Company Defendants would permit an abuse of the corporate privilege and would sanction fraud or promote injustice in that Defendant Vallas might escape liability for the causes of action set out herein and would permit an abuse of the corporate privilege and produce an inequitable result.

40.   Plaintiffs are informed and believe, and on that basis allege, that each Defendant acted pursuant to and within the scope of the relationships alleged above, that each Defendant knew or should have known about, and authorized, ratified, adopted, approved, controlled, and aided and abetted the conduct of all other Defendants.

41.   The true names and/or capacities, whether individual, corporate, associate or otherwise of Defendants 1 through 25, inclusive, are unknown to Plaintiffs at this time, and Plaintiffs, therefore, sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants fictitiously named herein as a DOE is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to and that the acts

Singh,
Singh &
Trauben,
LLP

and omissions of said Defendants were a legal cause of the resulting injury and damages to Plaintiffs as hereinafter alleged. Plaintiffs will amend this Complaint to assert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

## JURISDICTION AND VENUE

42.     This Court has original subject matter jurisdiction over this action by reason of Section 27 of the Securities Exchange Act of 1934 (the "Act"), which provides that federal courts "shall have exclusive jurisdiction" over "violations of [the Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Act] or the rules and regulations thereunder." 15 U.S.C. § 78 and 28 U.S.C. §§ 1331.

43.     Defendants are each subject to the general and specific jurisdiction of this Court as they reside and operate in this Judicial District.

44.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(c), and pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this Judicial District and the Defendants reside, operate and conduct ongoing and continuous business activities in this State and Judicial District.

## FACTUAL BACKGROUND

### Plaintiff Hampton

45.     In November 2016, during an in-person meeting between Vallas and Hampton conducted during a thought leader and business conference held on a sea cruise, Vallas represented to Hampton that Vallas was a highly successful restaurateur with a history of operating restaurants at a profit, and that he was developing a new restaurant in Venice, California.

46.     Vallas further represented to Hampton that the Business was wholly owned by A.K.S. Corp., that A.K.S. Corp.'s sole purpose was to own and operate the Business, that A.K.S. Corp. had no other assets or liabilities unrelated to the Business, and that, as

Singh,
Singh &
Trauben,
LLP

a result, if Hampton agreed to give Vallas $50,000.00, Hampton would acquire fifty (50) shares of common stock in A.K.S. Corp. and thereby obtain an ownership interest in the Business and the right to participate in the revenues and profits derived from the Business as a whole.

47.     Vallas further represented to Hampton a valuation of A.K.S. Corp.'s common stock at $1,000 per share and that this was a fair market valuation of the worth of A.K.S. Corp.'s common stock based upon Vallas' valuation of the worth of the Business.

48.     Vallas further represented that A.K.S. Corp. wholly owned and operated the Business and was the recipient of one hundred (100%) of the revenues and profits derived from the operation of the Business.

49.     Accordingly, at all times relevant, Hampton's understanding was that as an owner of fifty (50) shares of A.K.S. Corp.'s common stock, Hampton would be entitled to profit distributions from the Business.

50.     At this in-person meeting, Vallas represented to Hampton that based upon his past financial success, Hampton would recoup the principal on her investment within approximately two (2) years from the time of her investment and earn profits thereafter.

51.     Vallas further represented that Hampton's role as a shareholder would be as a passive, minority owner, and that Vallas would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements.

52.     In support of these representations, Vallas presented Hampton with an "Investor Presentation", which consisted of a marketing deck and monetary projections (the "Investor Presentation"). A true and copy of the Investor Presentation is attached hereto as **Exhibit "A"**.

53.     The Investor Presentation highlights a purported picture of Vallas' "proven track" record in the industry, referencing information and data allegedly based on the performance of Vallas' then existing restaurant called "*Leona*" in Venice, California, and provides monetary projections for the Business – then termed the "AK Social

Singh,
Singh &
Trauben,
LLP

House" – reflecting gross profit margins as high as seventy-percent (70%) and projected capital distributions totaling around $500,000 for the first year, over $1,000,000 for the second year and ever upward thereafter.

54. The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

55. Hampton had never previously invested in a bar or restaurant.

56. On or around December 9, 2016, in reliance upon Vallas' representations and based upon the Investor Presentation, Plaintiff Hampton entered into a written subscription agreement wherein Hampton agreed to invest $50,000 into A.K.S. Corp. in exchange for fifty (50) shares of A.K.S. Corp.'s common stock (the "Hampton Subscription Agreement").

57. Hampton in fact paid, and Defendants accepted and retained, the sum of $50,000.00.

58. Notwithstanding the Hampton Security Agreement and Defendants' inducement, acceptance and retention of Hampton's $50,000, Defendants never provided Hampton with any stock certificate(s) or other legally cognizable security or ownership interest in return for her investment and refused to provide full and timely accountings or to make all profit distributions as required.

59. Despite Hampton' specific requests for Defendants to provide Hampton with a Schedule K-1, and despite Defendants' written promises to so provide one, Defendants never provided Hampton with a Schedule K-1.

60. Defendants failed to comply with the California Corporation Code's requirements to provide annual reports and, in addition, when served with a demand letter on or around March 12, 2019 pursuant to Sections 1501(a) and 1601 of the California Code of Corporations, demanding that Defendants mail the documents that were required to be provided under Section 1501(a) and to further permit the inspection of A.K.S. Corp. and the Business' books and records under Section 1601, Defendants

COMPLAINT

Singh,
Singh &
Trauben,
LLP

refused to mail the required documents or to permit any such inspection.

**Plaintiff Skyline**

61.     Daniel Gnecco ("Gnecco") is a member and authorized representative of Plaintiff Skyline.

62.     In or around December, 2016, during an in-person meeting between Vallas and Gnecco at Menotti's Coffee Stop in Venice, California, Vallas represented to Gnecco that Vallas was a highly successful restaurateur with a history of operating restaurants at a profit, and that he was developing a new restaurant in Venice, California.

63.     Vallas further represented to Gnecco and Skyline that the Business was wholly owned by A.K.S. Corp., that A.K.S. Corp.'s sole purpose was to own and operate the Business, that A.K.S. Corp. had no other assets or liabilities unrelated to the Business and that, as a result, if Skyline agreed to give Vallas $25,000, Skyline would acquire ten (10) shares of A.K.S. Corp.'s common stock and thereby obtain an ownership interest in the Business and the right to participate in the profits derived from the Business as a whole.

64.     Vallas represented to Gnecco and Skyline a valuation of A.K.S. Corp.'s common stock at $2,500 per share and that this was a fair market valuation of the worth of A.K.S. Corp.'s common stock based on Vallas' valuation of the worth of the Business.

65.     Vallas further represented that A.K.S. Corp. wholly owned and operated the Business and was the recipient of one hundred (100%) of the revenues and profits derived from the operation of the Business.

66.     Accordingly, at all times, Gnecco's understanding was that Skyline, as an owner of ten (10) shares of A.K.S. Corp.'s common stock, would be entitled to profit distributions from the Business.

67.     Vallas, in representing to Gnecco and Skyline that he would sell shares in A.K.S. Corp. for $2,500 per share, did not disclose to Gnecco and Skyline that he had sold Hampton shares at a valuation of $1,000 per share.

Singh,
Singh &
Trauben,
LLP

68. At this in-person meeting, Vallas represented to Gnecco that based upon his past financial success, Skyline would recoup the principal on Skyline's investment within approximately eighteen (18) months of Skyline's investment.

69. Vallas further represented to Gnecco that Skyline's role as a common stock owner would be as a passive, minority owner, and that Vallas would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements.

70. In support of these representations, Vallas presented Gnecco with a copy of the Investor Presentation.

71. The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

72. Neither Gnecco or Skyline had ever previously invested in a bar or restaurant.

73. On or around December 21, 2016, in reliance upon Vallas' representations and based upon the Investor Presentation, Skyline entered into a written subscription agreement wherein Skyline agreed to invest $25,000 into A.K.S. Corp. in exchange for ten (10) shares of A.K.S. Corp.'s common stock (the "Skyline Subscription Agreement").

74. Skyline paid, and Defendants accepted and retained, the sum of $25,000.

75. Notwithstanding the Skyline Subscription Agreement and Defendants' inducement, acceptance and retention of Skyline's $25,000, Defendants never provided Skyline with any stock certificate(s) or other cognizable security or ownership interest in return for Skyline investment, and refused to provide full and timely accountings or make all profit distributions as required.

76. Despite Skyline's specific requests for Defendants to provide Skyline with a Schedule K-1, and despite Defendants' written promises to so provide one, Defendants never provided Skyline with a Schedule K-1.

COMPLAINT

Singh,
Singh &
Trauben,
LLP

77.    Defendants failed to comply with the California Corporation Code's requirements to provide annual reports and, in addition, when served with a demand letter on or around March 12, 2019 pursuant to Sections 1501(a) and 1601 of the California Code of Corporations, demanding that Defendants mail the documents that were required to be provided under Section 1501(a) and to further permit the inspection of A.K.S. Corp. and the Business' books and records under Section 1601, Defendants refused to mail the required documents or to permit any such inspection.

### **Plaintiff Huberman**

78.    In or around the first quarter of 2017, during an in-person meeting between Vallas and Huberman at Vallas' then restaurant *Leona* in Venice, California, Vallas represented to Huberman that Vallas was a highly successful restaurateur with a history of operating restaurants at a profit, and that he was developing a new restaurant in Venice, California.

79.    Vallas further represented to Huberman that the Business was wholly owned by A.K.S. Corp., that A.K.S. Corp.'s sole purpose was to own and operate the Business, that A.K.S. Corp. had no other assets or liabilities unrelated to the Business and that, as a result, if Huberman agreed to give Vallas $25,000, Huberman would become an owner of a single (1) share of A.K.S. Corp.'s common stock and thereby participate in the profits derived from the Business as a whole.

80.    Vallas represented to Huberman a valuation of A.K.S. Corp.'s common stock at $25,000 per share and that this was a fair market valuation of the worth of A.K.S. Corp.'s common stock based on Vallas' valuation of the worth of the Business.

81.    Vallas further represented that A.K.S. Corp. wholly owned and operated the Business and was the recipient of one hundred (100%) of the revenues and profits derived from the operation of the Business.

82.    Accordingly, at all times, Huberman's understanding was that as an owner of one (1) share of A.K.S. Corp.'s common stock, Huberman would thereby obtain an ownership interest in the Business and the right to participate in the profits derived from

Singh,
Singh &
Trauben,
LLP

the Business as a whole.

83.     Vallas, in representing to Huberman that he would sell shares in A.K.S. Corp. for $25,000 per share did not disclose to Huberman that he sold shares in A.K.S. Corp. to Hampton at a valuation of $1,000 per share and to Skyline at a valuation of $2,500 per share.

84.     At this in-person meeting, Vallas represented to Huberman that based upon his past financial success, Huberman would recoup the principal on Huberman's investment within one year of his investment.

85.     Vallas further represented to Huberman that Huberman's role as a common stock owner would be as a passive, minority owner, and that Vallas would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements.

86.     In support of these representations, Vallas presented Huberman with a copy of the Investor Presentation.

87.     The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

88.     Huberman had never previously invested in a bar or restaurant.

89.     On or around April 17, 2017, in reliance upon Vallas' representations, Huberman entered into a written subscription agreement wherein Huberman agreed to invest $25,000 into A.K.S. Corp. in exchange for one (1) share of A.K.S. Corp. common stock (the "Huberman Subscription Agreement").

90.     Huberman paid, and Defendants accepted and retained, the sum of $25,000.

91.     Notwithstanding the Huberman Subscription Agreement and Defendants' inducement, acceptance and retention of Huberman's $25,000, Defendants never provided Huberman with any stock certificate(s) or other cognizable security or ownership interest in return for his investment, and refused to provide full and timely accountings or make all distribution payments as required.

Singh,
Singh &
Trauben,
LLP

92.     Despite Huberman's specific requests for Defendants to provide Huberman with a Schedule K-1, and despite Defendants' written promises to so provide one, Defendants never provided Huberman with a Schedule K-1.

93.     Defendants failed to comply with the California Corporation Code's requirements to provide annual reports and, in addition, when served with a demand letter on or around March 12, 2019 pursuant to Sections 1501(a) and 1601 of the California Code of Corporations, demanding that Defendants mail the documents that were required to be provided under Section 1501(a) and to further permit the inspection of A.K.S. Corp. and the Business' books and records under Section 1601, Defendants refused to mail the required documents or to permit any such inspection.

**Plaintiff Windward Loop**

94.     Ely Sandvik ("Sandvik") is a member, manager and authorized representative of Plaintiff Windward Loop.

95.     In or around the month of April, 2017, during an in-person meeting between Vallas and Sandvik at Vallas' restaurant *Leona* in Venice, California, Vallas represented to Sandvik that Vallas was a highly successful restaurateur with a history of operating restaurants at a profit, and that he was developing a new restaurant in Venice, California.

96.     Vallas further represented to Sandvik and Windward Loop that the Business was wholly owned by A.K.S. Corp., that A.K.S. Corp.'s sole purpose was to own and operate the Business, that A.K.S. Corp. had no other assets or liabilities unrelated to the Business and consequently that if Windward Loop agreed to give Vallas $250,000, Windward Loop would acquire twenty (20) shares of A.K.S. Corp.'s common stock and thereby participate in the profits derived from the Business as a whole.

97.     Vallas represented to Sandvik and Windward Loop a valuation of A.K.S. Corp.'s common stock at $12,500 per share and that this was a fair market valuation of the worth of A.K.S. Corp.'s common stock based on Vallas' valuation of the worth of the Business.

98.     Vallas further represented that A.K.S. Corp. wholly owned and operated the

Singh,
Singh &
Trauben,
LLP

Business and was the recipient of one hundred (100%) of the revenues and profits derived from the operation of the Business.

99.   Accordingly, at all times, Sandvik's understanding was that Windward Loop, as an owner of twenty (20) shares of A.K.S. Inc's common stock, would be entitled to profit distributions from the Business.

100.   Vallas, in representing to Sandvik and Windward Loop that he would sell shares in A.K.S. Corp. for $12,500 per share did not disclose to Sandvik and Windward Loop that he had sold Hampton shares in A.K.S. Corp. at a valuation of $1000 a share, Skyline shares in A.K.S. Corp. at a valuation of $2,500 a share and Huberman at a valuation of $25,000 a share.

101.   At this in-person meeting, Vallas represented to Sandvik that based upon his past financial success, Windward Loop would recoup the principal on Windward Loop's investment within approximately one year of Windward Loop's investment.

102.   Vallas further represented to Sandvik that Windward Loop's role as a common stock owner would be as a passive, minority owner, and that Vallas would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements.

103.   In support of these representations, Vallas presented Sandvik with a copy of the Investor Presentation.

104.   The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

105.   Neither Sandvik nor Windward Loop had ever previously invested in a bar or restaurant.

106.   On or around May 17, 2017, in reliance upon Defendants' representations, Windward Loop entered into a written subscription agreement wherein Windward Loop agreed to invest $250,000 into A.K.S. Corp. in exchange for twenty (20) shares of A.K.S. Corp.'s common stock (the "Windward Subscription Agreement").

Singh, Singh & Trauben, LLP

107.   Defendants represented to Sandvik and Windward Loop that twenty (20) shares of A.K.S. Inc's common stock was equal to Twenty Percent (20%) of the then currently exercised shares in the A.K.S. Inc.

108.   Windward Loop paid and Defendants accepted and retained the sum of $250,000.

109.   Despite the Windward Subscription Agreement and Defendants' inducement, acceptance and retention of Windward Loop's $250,000, Defendants never provided Windward Loop with any stock certificate(s) or other cognizable security or ownership interest in return for its investment, and refused to provide full and timely accountings or make profit distributions as required.

110.   Despite Windward Loop's specific requests for Defendants to provide Windward Loop with a Schedule K-1, and further despite Defendants' written promises to so provide one, Defendants never provided Windward Loop with a Schedule K-1.

111.   Defendants failed to comply with the California Corporation Code's requirements to provide annual reports and, in addition, when served with a demand letter on or around March 12, 2019 pursuant to Sections 1501(a) and 1601 of the California Code of Corporations, demanding that Defendants mail the documents that were required to be provided under Section 1501(a) and to further permit the inspection of A.K.S. Corp. and the Business' books and records under Section 1601, Defendants refused to mail the required documents or to permit any such inspection.

**Plaintiff Terepka**

112.   In or around the first quarter of 2017, during an in-person meeting between Vallas and Plaintiff Terepka at Vallas' restaurant *Leona* in Venice, California, Vallas represented to Terepka that Vallas was a highly successful restaurateur with a history of operating restaurants at a profit, and that he was developing a new restaurant in Venice, California.

113.   Vallas further represented to Terepka that the Business was wholly owned by A.K.S. Corp., that A.K.S. Corp.'s sole purpose was to own and operate the Business,

that A.K.S. Corp. had no other assets or liabilities unrelated to the Business and that, as a result, if Terepka agreed to give Vallas $100,000, Terepka would become an owner of six (6) shares of A.K.S. Corp.'s common stock and thereby participate in the profits derived from the Business as a whole.

114.   Vallas represented to Terepka a valuation of A.K.S. Corp.'s common stock at $16,666.66 per share and that this was a fair market valuation of the worth of A.K.S. Corp.'s common stock based on Vallas' valuation of the worth of the Business.

115.   Vallas further represented that A.K.S. Corp. wholly owned and operated the Business and was the recipient of one hundred (100%) of the revenues and profits derived from the operation of the Business.

116.   Accordingly, at all times, Terepka's understanding was that as an owner of six (6) shares of A.K.S. Corp.'s common stock, Terepka would thereby obtain an ownership interest in the Business and the right to participate in the profits derived from the Business as a whole.

117.   Vallas, in representing to Terepka that he would sell shares in A.K.S. Corp. for $16,666.66 per share, did not disclose to Terepka that he had sold shares to Hampton at a valuation of $1,000 per share, Skyline at a valuation of $2,500 per share, Huberman at a valuation of $25,000 per share and to Windward Loop at a valuation of $12,500 per share.

118.   At this in-person meeting, Vallas represented to Terepka that Terepka would recoup the principal on Terepka's investment within eighteen (18) months of Terepka's investment.

119.   Vallas further represented to Terepka that Terepka's role as a common stock owner would be as a passive, minority owner, and that Vallas would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements.

120.   In support of these representations, Vallas presented Terepka with a copy of the Investor Presentation.

Singh, Singh & Trauben, LLP

121.   The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

122.   Terepka had never previously invested in a bar or restaurant.

123.   On or around May 27, 2017, in reliance upon Vallas' representations, Terepka entered into a written subscription agreement wherein Terepka agreed to invest $100,000 into A.K.S. Corp. in exchange for six (6) shares of A.K.S. Corp. common stock (the "Terepka Subscription Agreement").

124.   Terepka paid, and Defendants' accepted and retained, the sum of $100,000.

125.   Notwithstanding Defendants' inducement and execution of the Terepka Subscription Agreement and later acceptance and retention of Terepka's $100,000, Defendants never provided Terepka with any stock certificate(s) or other cognizable security or ownership interest in return for his investment, and refused to provide full and timely accountings or make profit distributions as required.

126.   Defendants never provided Terepka with a Schedule K-1.

127.   Defendants also failed to comply with the California Corporation Code's requirements to provide annual reports and have never permitted an inspection of A.K.S. Corp. or the Business' books and records by Terepka.

### Plaintiff Carasso

128.   In or around the second quarter of 2017, during an in-person meeting between Vallas and Carasso, Vallas represented to Carasso that Vallas was a highly successful restaurateur with a history of operating restaurants at a profit, and that he was developing a new restaurant in Venice, California.

129.   Vallas further represented to Carasso that the Business was wholly owned by A.K.S. Corp., that A.K.S. Corp.'s sole purpose was to own and operate the Business, that A.K.S. Corp. had no other assets or liabilities unrelated to the Business and consequently that if Carasso agreed to give Vallas $50,000, Carasso would become an owner of three (3) shares of A.K.S. Corp.'s common stock and thereby participate in the

Singh,
Singh &
Trauben,
LLP

profits derived from the Business as a whole.

130. Vallas represented to Carasso a valuation of A.K.S. Corp.'s common stock at $16,666.66 per share and that this was a fair market valuation of the worth of A.K.S. Corp.'s common stock based on Vallas' valuation of the worth of the Business.

131. Vallas further represented that A.K.S. Corp. wholly owned and operated the Business and was the recipient of one hundred (100%) of the revenues and profits derived from the operation of the Business.

132. At all times, Carasso's understanding was that as an owner of three (3) shares of A.K.S. Corp.'s common stock, Carasso would thereby obtain an ownership interest in the Business and the right to participate in the profits derived from the Business as a whole.

133. Vallas, in representing to Carasso that he would sell shares to Carasso in A.K.S. Corp. for $16,666.66 per share, did not disclose to Carasso that he had sold shares to Hampton at a valuation of $1,000 per share, Skyline at a valuation of $2,500 per share, Huberman at a valuation of $25,000 per share, Windward Loop at a valuation of $12,500 a share and to Terepka at $16,666.66 per share.

134. At this in-person meeting, Vallas represented to Carasso that Carasso would recoup the principal on Carasso's investment within one year of Carasso's investment.

135. Vallas further represented to Carasso that Carasso's role as a common stock owner would be as a passive, minority owner, and that Vallas would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements.

136. In support of these representations, Vallas presented Carasso with a copy of the Investor Presentation.

137. The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

138. Carasso had never previously invested in a bar or restaurant.

Singh,
Singh &
Trauben,
LLP

20

COMPLAINT

139.   In or around the second quarter of 2017, in reliance upon Vallas' representations, Carasso entered into a written subscription agreement wherein Carasso agreed to invest $50,000 into A.K.S. Corp. in exchange for three (3) shares of A.K.S. Corp.'s common stock (the "Carasso Subscription Agreement").

140.   Defendants represented to Carasso that three (3) shares of A.K.S. Corp.'s common stock represented three percent (3%) of all currently exercised shares in A.K.S. Corp.

141.   Shortly following the full execution of the Carasso Subscription Agreement, Carasso paid, and Defendants accepted and retained, the sum of $50,000.

142.   Notwithstanding Defendants' inducement and execution of the Carasso Subscription Agreement and later acceptance and retention of Carasso's $50,000, Defendants never provided Carasso with any stock certificate(s) or other cognizable security or ownership interest in return for his investment, and refused to provide any accounting or make any payment of any kind in return on the investment.

143.   Despite Carasso's specific requests for Defendants to provide Carasso with a Schedule K-1, and further despite Defendants' written promises to so provide, Defendants never provided Carasso with a Schedule K-1.

144.   Defendants failed to comply with the California Corporation Code's requirements to provide annual reports and, in addition, when served with a demand letter on or around March 12, 2019 pursuant to Sections 1501(a) and 1601 of the California Code of Corporations, demanding that Defendants mail the documents that were required to be provided under Section 1501(a) and to further permit the inspection of A.K.S. Corp. and the Business' books and records under Section 1601, Defendants refused to mail the required documents and to respond or to permit any such inspection.

## The Conversion of A.K.S. Corp. to A.K.S. LLC

145.   Each of the Plaintiffs' investments was solely into A.K.S. Corp. and each Plaintiff was to receive shares in that corporation.

146.   Plaintiffs were never advised at any time that Defendants converted A.K.S.

Singh,
Singh &
Trauben,
LLP

Corp. into a limited liability company.

147.   Defendants never disclosed to Plaintiffs at any time that A.K.S. Corp. was converted to a limited liability company.

148.   On or about January 30, 2017, Defendants converted A.K.S. Corp. to a limited liability company called A.K.S. LLC.

149.   Vallas signed the Limited Liability Company Articles of Organization – Conversion, which was filed on or around January 30, 2017.

150.   Prior to the Conversion, both Hampton and Skyline had already entered into the Hampton and Skyline Subscription Agreements with A.K.S. Corp.

151.   Nonetheless, Defendants never disclosed the Conversion to Hampton or Skyline, never sought Hampton or Skyline's approval of the Conversion, never presented any conversion plan to Hampton or Skyline, never proffered any amendment to the Hampton and Skyline Subscription Agreements to add A.K.S. LLC as the counter-party, never offered to have Hampton or Skyline become parties to any operating agreement for A.K.S. LLC and never converted or even offered to convert Hampton and Skyline's shares of common stock in A.K.S. Corp. to membership interests in A.K.S. LLC.

152. In addition, **after** the Conversion, Defendants induced Huberman, Windward Loop, Terepka and Carasso to enter into their Subscription Agreements, with Defendants' using A.K.S. Corp. as the counter-party to those Subscription Agreements and purporting to sell "common stock" in A.K.S. Corp. to these Plaintiffs despite the fact that the Conversion had already taken place and that A.K.S. Corp., having already been converted to a limited liability company, could neither issue nor sell common stock.

153.   Accordingly, compounding the fraud Defendants had already perpetrated upon Plaintiffs Hampton and Skyline, Defendants sold "shares" of non-existent "common stock" to each of Plaintiffs Huberman, Windward Loop, Terepka and Carasso in A.K.S. Corp., which had in fact been converted to the limited liability company A.K.S. LLC.

Singh,
Singh &
Trauben,
LLP

154.   None of the Plaintiffs were ever offered membership interests in A.K.S. LLC.

155.   None of the Plaintiffs were ever offered to view a draft of the A.K.S. LLC operating agreement or to become parties to the A.K.S. LLC operating agreement and have never become parties thereto.

156.   The Conversion helped facilitate Defendants' fraud, where "shares" in "common stock" were sold, with real money paid and retained by Defendants in the form of the Investment, but in exchange for which Defendants intentionally failed and refused to provide any security interest, any ownership interest in the Business or to distribute any proper return on the Investment.

157.   In sum, by advancing and perpetuating Defendants' false promises and representations that A.K.S. Corp. owned the Business, Defendants "sold" $500,000 in "shares" of "common stock" in A.K.S. Corp. despite this "common stock" being worthless and illusory.

### West Indies Trading Co. Corp.

158.   Further compounding Defendants' fraud, Vallas used yet another company, West Indies Trading, to own and operate the Business, all without any disclosure to Plaintiffs.

159.   Upon information and belief, Vallas solely owns and operates West Indies Trading.

160.   West Indies Trading owns and controls the most important aspects of the Business – its licenses to operate as a restaurant and caterer and to sell alcohol (the "Licenses").

161.   The Business has essentially no value without the Licenses, as it cannot operate without them.

162.   Defendants never disclosed to Plaintiffs that West Indies Trading owns the Licenses.

163.   Notably, neither A.K.S. Corp. nor A.K.S. LLC appear to hold any

COMPLAINT

Singh,
Singh &
Trauben,
LLP

restaurant or bar related licenses for the Business.

164.  Upon information and belief, West Indies Trading benefits and receives revenues from the Business, for which Defendants never account to the Plaintiffs and from which Plaintiffs never benefit.

165.  Indeed, the controller for the Business, Fernando Cabana, has indicated in communications that West Indies Trading is the true owner of the Business.

166.  Upon information and belief, Vallas and West Indies Trading are in fact the sole owners of the Business.

167.  Upon information and belief, West Indies Trading is a shell company, and the bulk, and perhaps all, of the revenues from the Business flow directly to Vallas through his shell company West Indies Trading.

168.  Accordingly, a vast bulk of the benefits of the Business, specifically the net earnings derived from the Business, have flowed entirely to Vallas and his company West Indies Trading, with only a *de minimis* fraction distributed to the Plaintiffs.

169.  Plaintiffs were defrauded out of their Investment and the returns on that Investment by these Defendants.

### **Defendants' Ongoing Fraud**

170.  Defendants' fraud is ongoing.

171.  From the Opening to the end of April 2019, the Business had total sales over $6 Million.

172.  Upon information and belief, the total sales to date are even higher.

173.  To date, Defendants have paid out a total of $50,000 to Plaintiffs.

174.  Throughout the course of the Business, Defendants have willfully concealed the accounting and true financial state of the Business.

175.  On multiple occasions Vallas has agreed to set up meetings with the Plaintiffs to discuss the state of the Business and the Investment, only to cancel those meetings or fail to attend.

176.  On multiple occasions Vallas and/or the Business' controller Fernando

Singh,
Singh &
Trauben,
LLP

Cabana promised the Plaintiffs accountings and financial statements regarding the Business, including that they would be provided on a monthly basis, only to never consistently provide these accountings and financial statements.

177. Further, the accountings and financial statements that Vallas and/or Fernando Cabana have provided have been partial, fragmented and incomplete. What information they do provide wildly deviates from the projections Vallas made in the Investor Presentation.

178. The Investor Presentation does not contain any warning of the risk of investment or that returns on investments may be different than what is promised in the Investor Presentation.

179. The limited and partial financial documents provided by Vallas are incomplete and do not provide a clear picture of total sales, much less what the profits are.

180. Plaintiffs have sent dozens of emails, made innumerable phone calls and sent dozens of text messages to Vallas to follow up on these issues and obtain information about their Investment and the Business, only to never receive adequate or accurate updates, accountings or financial information.

181. Compounding this deliberate refusal to respond to Plaintiffs' requests for information, Defendants failed to comply with the California Corporation Code's requirements to provide annual reports.

182. Moreover, on or around March 12, 2019, each of Hampton, Skyline, Windward Loop and Carasso served formal letter demands to Vallas pursuant to Sections 1501(a) and 1601 of the California Code of Corporations, demanding that Defendants mail the documents that were required to be provided under Section 1501(a) and to further permit the inspection of A.K.S. Corp. and the Business' books and records under Section 1601, Defendants refused to mail the required documents or to permit any such inspection.

183. Moreover, Vallas and/or West Indies Trading have been sued or been

COMPLAINT

subject to legal actions, debtor's examinations and, upon information and belief, Sherriff's liens, during the operation of the Business which directly and materially affected the Business but which were never disclosed to the Plaintiffs.

184.   Defendants continue to: (a) loot the revenues of the Business; (b) fail to make profit distributions to Plaintiffs; (c) make material misrepresentations to Plaintiffs; and (d) conceal material facts from Plaintiffs.

185.   The nature of this ongoing fraud compels the remedy of a receivership, as Vallas and his alter ego companies cannot be entrusted to continue to operate the Business and account to Plaintiffs. A receiver should be appointed by the Court to operate the Business and account to Plaintiffs. Plaintiffs have clear ownership and property rights in the Business and its revenues, and without a receiver, there is a clear and present danger of Plaintiff's ownership rights, property and funds being lost, destroyed or misappropriated and in fact Plaintiff's rights and property are currently and on an ongoing basis being lost, destroyed and misappropriated.

186.   All the below counts are plead, and to be construed, in the alternative where applicable and Plaintiffs reserve all rights and remedies.

**COUNT I**
**<u>SECURITIES FRAUD</u>**
**(Securities Exchange Act of 1934, § 10(b))**
***(Against all Defendants)***

187.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

188.   Defendants, to induce Plaintiffs to enter into and execute the Subscription Agreements and agree to transfer their respective Investments to Defendants, knowingly made material misrepresentations and false assurances to Plaintiffs, including, without limitation, including the following material misrepresentations (many of which also concealed material facts) to Plaintiffs with scienter, knowledge of wrongdoing and intent to defraud:

      a.   That the Investor Presentation was accurate and that the projections

Singh,
Singh &
Trauben,
LLP

contained therein for the Business were accurate;

b.     That the Business was wholly owned by A.K.S. Corp. and that, if Plaintiffs invested, they would acquire common stock in A.K.S. Corp. and thereby become owners of the Business and participate in profits from the Business;

c.     That A.K.S. Corp., as the sole owner of the Business was the recipient of one hundred percent (100%) of the revenues and profits derived from the operation of the Business;

d.     That if Plaintiffs made their respective Investments, Plaintiffs would receive shares of common stock in A.K.S. Corp. based upon a fair market evaluation of AKS Corp. thereby securing a percentage right to all revenues and profits derived from the Business;

e.     Plaintiffs' role as a common share owner would be as a passive, minority owner, and that Defendants would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements;

f.     Plaintiffs would receive accountings and financial statements accurately reflecting the Business' financial position, including income expenses and business performance;

g.     Plaintiffs would receive profits distributions from the Business in proportion to their ownership interests;

h.     Plaintiffs would recoup the principal on their respective Investments within one to two years of their Investments;

i.     Defendants would deliver to Plaintiffs stock certificate(s) or other cognizable security or ownership interest in the A.K.S. Corp., and hence the Business, in return for their Investments;

j.     The Business was operated by an experienced team of honest people;

k.     Plaintiffs would receive regular updates and financial information

Singh,
Singh &
Trauben,
LLP

from Defendants about the Business, including all reporting and inspection rights required by law; *and*

l.      Plaintiffs would receive Statement K-1s for the Business.

189.   Defendants knew the above representations were false when they made them, and knew they would not carry out the promises made in their representations, which scienter is further born out by Defendants acts and omissions, which prove and/or provide a strong inference of Defendants fraudulent intent.

190.   Plaintiffs, who had never invested in bars and restaurants before, reasonably relied on these material representations in making the Investment and in purchasing the common stock Plaintiffs believed they were purchasing in A.K.S. Corp., as these representations were made by Vallas who held himself out as an experienced expert in the bar and restaurant business with a "track record" as set forth in the Investor Presentation.

191.   Plaintiffs reliance was further reasonable, as the Investor Presentation the so-called "expert" Vallas provided did not warn of any risk in the Investment, and Vallas further never warned of risk in the Investment.

192.   Defendants never warned the Plaintiffs that they could lose their entire Investment, that different companies Plaintiffs were unaware of would benefit from the Investment, that Vallas would use shell companies such as West Indies Trading to personally benefit and loot the company, and that the Plaintiffs would never receive proper accountings or updates on their Investment.

193.   In addition, among other materially false statements and related omissions, Defendants never disclosed the Conversion, never proposed a conversion plan to Plaintiffs or allowed the Plaintiffs as shareholders in A.K.S. Corp. to approve the Conversion, never converted Plaintiffs common stock to membership interests in A.K.S. LLC and never made Plaintiffs parties to the operating agreement for A.K.S. LLC nor even offered to do so.

194.   In addition, among other materially false statements and related omissions,

Defendants failed to inform Plaintiffs of Defendants' intention to disburse revenues and profits of the Business directly to Vallas and West Indies Trading and/or that they would engage in comingling of such revenues and profits with other businesses or companies owned and/or controlled by Defendants, purposefully draining the revenues of the Business to ensure no remaining monies were or are distributed or disbursed to any minority members or owners, including Plaintiffs.

195.   Defendants' representations were false when made and Defendants' material omissions were willfully concealed.

196.   Defendants sold common stock in A.K.S. Corp. and common stock in a corporation is a security. Defendants' misrepresentations and material omissions, which were to induce the purchase of this common stock, were thereby directly connected to the sale of securities, namely the sale of common stock in A.K.S. Corp. in exchange for the Investment.

197.   Defendants' misrepresentations and assurances in this regard, along with their material omissions, were designed to solicit and entice Plaintiffs, at Plaintiffs' significant detriment and expense, to transfer the sum of no less than the $500,000 Investment to Defendants.

198.   Plaintiffs materially and reasonably relied upon the foregoing representations made by Defendants, and in reliance on the same, agreed to transfer the sum of $500,000 Investment to Defendants pursuant to the Subscription Agreements.

199.   Plaintiffs acted in justifiable and reasonable reliance upon Defendants' material representations and assurances as, at the time Defendants made such representations, Plaintiffs did not know of the falsity of the representations, and could not, in the exercise of reasonable diligence, have discovered the falsity of such representations.

200.   As a direct and proximate result of Plaintiffs' justifiable reliance upon Defendants' misrepresentations, Plaintiffs have suffered significant and extensive economic loss, losing virtually their entire Investment and/or never being paid the profits

they are due, which losses were caused by the above outlined securities fraud perpetrated by the Defendants.

201.    These economic losses were caused by Defendants' material misrepresentations and omissions.

202.    Plaintiffs are entitled to actual and specific damages, including the total of the Investment and/or any profits due to Plaintiffs from the Business, along with consequential damages.

## COUNT II
## SECURITIES FRAUD
**(Violation of California Corporation Code § 25501.5 – Unlicensed Broker-Dealer)**
***(Against all Defendants)***

203.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

204.    Defendants sold common stock in A.K.S. Corp. to Plaintiffs in exchange for the $500,000 Investment.

205.    Defendants' sale of common stock in A.K.S. Corp. was the sale of securities.

206.    At the time of sale and purchase of the common stock in A.K.S. Corp. Defendants were required to be licensed as broker dealers.

207.    At the time of sale and purchase of the common stock in A.K.S. Corp. no Defendants had applied for nor secured a certificate under Title 4, Division 1, Part 3, Chapter 2 of the California Corporations Code authorizing Defendants to act in that capacity as broker-dealers.

208.    As a result of the above described acts Defendants are liable to Plaintiffs who are entitled to and hereby do rescind the above described purchase of the securities in A.K.S. Corp.

209.    To the extent any conveyance of the applicable securities was made to Plaintiffs, Plaintiffs will tender before entry of judgment to Defendants the shares/units/interest of the above described securities.

Singh,
Singh &
Trauben,
LLP

210. Plaintiffs are therefore entitled to an order rescinding the purchase of the securities in A.K.S. Corp. and to recover from Defendants, and each of them, the amount of their respective Investment plus prejudgment interest as allowed by law and subject to proof at trial.

**COUNT III**
**<u>FRAUD IN THE INDUCEMENT</u>**
*(Against all Defendants)*

211. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

212. Defendants, to induce Plaintiffs to enter into and execute the Subscription Agreements and agree to transfer their respective Investments to Defendants, knowingly made material misrepresentations and false assurances to Plaintiffs, including, without limitation, the promise that the revenues from the Business would be distributed fairly and in proportion to the parties' respective partnership interests.

213. In addition, Vallas, and the Company Defendants by and through Vallas, made the following false representations to Plaintiffs:

    a. That the Investor Presentation was accurate and that the projections contained therein for the Business were accurate;

    b. That the Business was wholly owned by A.K.S. Corp. and that, if Plaintiffs invested, they would acquire common stock in A.K.S. Corp. and thereby become owners of the Business and participate in profits from the Business;

    c. That A.K.S. Corp., as the sole owner of the Business was the recipient of one hundred percent (100%) of the revenues and profits derived from the operation of the Business;

    d. If Plaintiffs made their respective Investments, Plaintiffs would receive shares of common stock in A.K.S. Corp. based upon a fair market evaluation of AKS Corp. thereby securing a percentage right to all

Singh,
Singh &
Trauben,
LLP

revenues and profits derived from the Business;

e. Plaintiffs' role as a common share owner would be as a passive, minority owner, and that Defendants would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements;

f. Plaintiffs would receive accountings and financial statements accurately reflecting the Business' financial position, including income expenses and business performance;

g. Plaintiffs would receive profits distributions from the Business in proportion to their ownership interests;

h. Plaintiffs would recoup the principal on their respective Investments within one to two years of their Investments;

i. Defendants would deliver to Plaintiffs stock certificate(s) or other cognizable security or ownership interest in the A.K.S. Corp., and hence the Business, in return for their Investments;

j. The Business was operated by an experienced team of honest people;

k. Plaintiffs would receive regular updates and financial information from Defendants about the Business, including all reporting and inspection rights required by law; *and*

l. Plaintiffs would receive Statement K-1s for the Business.

214. In addition, among other material false statements and related omissions, Defendants failed to inform Plaintiffs of Defendants' intention to disburse revenues and profits of the Business directly to Vallas or West Indies Trading and/or comingle such revenues and profits with other businesses or companies owned and/or controlled by Defendants, purposefully draining the entire company account to ensure no remaining monies were or are distributed or disbursed to any minority members or owners, including Plaintiffs.

215. The foregoing representations were false when made and Defendants knew

they were false when they were made.

216.   Each of these misrepresentations and material omissions, and concealment of facts were knowingly made by Defendants with the intent to defraud Plaintiffs by inducing their reliance on these representations and material omissions with the goal of Defendants illegally retaining Plaintiffs Investment and with the goal of Defendants illegally avoiding payment of appropriate profit distributions to Plaintiffs.

217.   At the time the Defendants made the foregoing material representations and promises to Plaintiffs, such representations and promises were false and, in addition, Defendants had no intention of fully performing under the terms of the parties' Subscription Agreements, and knew that all such representations were false when made.

218.   Defendants made such representations pertaining to promising future action with no intention of performing or with a positive intention of not performing on such promises.

219.   Moreover, Defendants, at all times, knew that Plaintiffs were heavily relying upon the foregoing representations in agreeing to transfer the sum of no less than the $500,000.00 Investment to Defendants.

220.   Defendants knew the above representations were false when they made them, and knew they would not carry out the promises made in their representations, which scienter is further borne out by Defendants acts and omissions, which prove and/or provide a strong inference of Defendants fraudulent intent.

221.   Plaintiffs acted in justifiable reliance upon the Defendants' material misrepresentations, promises and assurances as, at the time Defendants made such representations, Plaintiffs did not know of the falsity of the representations and, in addition, were not aware of Defendants' complete lack of intention to fully perform under the Subscription Agreements, and could not, in the exercise of reasonable diligence, have discovered Defendants' positive intention of not performing.

222.   Indeed, Plaintiffs, who had never invested in bars and restaurants before, reasonably relied on these material representations in making the Investment and in

COMPLAINT

Singh,
Singh &
Trauben,
LLP

purchasing the common stock Plaintiffs believed they were purchasing in A.K.S. Corp., as these representations were made by Vallas who held himself out as an experienced expert in the bar and restaurant business with a "track record" as set forth in the Investor Presentation.

223. Plaintiffs reliance was further reasonable, as the Investor Presentation the so-called "expert" Vallas provided did not warn of any risk in the Investment, and Vallas further never warned of risk in the Investment.

224. Defendants never warned the Plaintiffs that they could lose their entire Investment, that different companies Plaintiffs were unaware of would benefit from the Investment, that Vallas would use shell companies such as West Indies Trading to personally benefit, and that the Plaintiffs would never receive proper accountings or updates on their Investment.

225. In addition, among other materially false statements and related omissions, Defendants never disclosed the Conversion, never proposed a conversion plan to Plaintiffs or allowed the Plaintiffs as shareholders in A.K.S. Corp. to approve the Conversion, never converted Plaintiffs common stock to membership interests in A.K.S. LLC and never made Plaintiffs parties to the operating agreement for A.K.S. LLC nor even offered to do so.

226. As a direct and proximate result of Plaintiffs' justifiable reliance upon Defendants' fraudulent misrepresentations, Plaintiffs have suffered significant and extensive damages and financial injury.

227. Defendants' conduct was done intentionally and willfully with the purpose and design to defraud Plaintiffs. Defendants knew that their conduct would cause Plaintiffs great financial harm.

228. Further, Defendants' conduct was wanton, willful and completely devoid of any legitimate purpose. Left unchecked, Defendants will seek to defraud and cause harm to others. As a result, Plaintiffs are entitled to award of punitive damages to both punish Defendants and to dissuade them from engaging in similar wrongful conduct in the

Singh,
Singh &
Trauben,
LLP

future all in amount subject to proof at trial.

229. Further, the nature of Defendants' fraud compels the remedy of a receivership, as Vallas and his alter ego companies cannot be entrusted to continue to operate the Business and account to Plaintiffs. A receiver should be appointed by the Court to operate the Business and account to Plaintiffs. Plaintiffs have clear ownership and property rights in the Business and its revenues, and without a receiver, there is a clear and present danger of Plaintiff's ownership rights, property and funds being lost, destroyed or misappropriated and in fact Plaintiff's rights and property are currently and on an ongoing basis being lost, destroyed and misappropriated.

## COUNT IV
## FRAUD
### (Against all Defendants)

230. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

231. Defendants are engaged in fraud including on an ongoing basis against Defendants.

232. In addition, Vallas, and the Company Defendants by and through Vallas, made the following material misrepresentations to Plaintiffs with scienter, knowledge of their wrongdoing and intent to defraud:

    a. That the Investor Presentation was accurate and that the projections contained therein for the Business were accurate;

    b. That the Business was wholly owned by A.K.S. Corp. and that, if Plaintiffs invested, they would acquire common stock in A.K.S. Corp. and thereby become owners of the Business and participate in profits from the Business;

    c. That A.K.S. Corp., as the sole owner of the Business was the recipient of one hundred percent (100%) of the revenues and profits derived from the operation of the Business;

Singh,
Singh &
Trauben,
LLP

d.  If Plaintiffs made their respective Investments, Plaintiffs would receive shares of common stock in A.K.S. Corp. based upon a fair market evaluation of AKS Corp. thereby securing a percentage right to all revenues and profits derived from the Business;

e.  Plaintiffs' role as a common share owner would be as a passive, minority owner, and that Defendants would manage and run the Business and all its affairs, including its accounting and all other corporate functions and requirements;

f.  Plaintiffs would receive accountings and financial statements accurately reflecting the Business' financial position, including income expenses and business performance;

g.  Plaintiffs would receive profits distributions from the Business in proportion to their ownership interests;

h.  Plaintiffs would recoup the principal on their respective Investments within one to two years of their Investments;

i.  Defendants would deliver to Plaintiffs stock certificate(s) or other cognizable security or ownership interest in the A.K.S. Corp., and hence the Business, in return for their Investments;

j.  The Business was operated by an experienced team of honest people;

k.  Plaintiffs would receive regular updates and financial information from Defendants about the Business, including all reporting and inspection rights required by law; *and*

l.  Plaintiffs would receive Statement K-1s for the Business.

a.  That the financial statements and accountings after the Opening and throughout the course of the Business were accurate;

b.  Affirmatively concealing and mispresenting the true financial state of the Business and the status of the Investment;

c.  Looting the Business by transferring profits and funds to Vallas and/or

West Indies Trading directly; *and*

o.  Concealing lawsuits, liens and other negative material events about the Business and Defendants' mismanagement of the same from Plaintiffs.

233.   Each of these misrepresentations and material omissions, and concealment of facts were and are knowingly made by Defendants with the intent to defraud Plaintiffs by inducing their reliance on these representations and material omissions with the goal of Defendants illegally retaining Plaintiffs Investment and with the goal of Defendants illegally avoiding payment of appropriate profit distributions to Plaintiffs.

234.   Indeed, Plaintiffs, who had never invested in bars and restaurants before, reasonably relied on these material representations in making the Investment and in purchasing the common stock Plaintiffs believed they were purchasing in A.K.S. Corp., as these representations were made by Vallas who held himself out as an experienced expert in the bar and restaurant business with a "track record" as set forth in the Investor Presentation.

235.   Plaintiffs reliance was further reasonable, as the Investor Presentation the so-called "expert" Vallas provided did not warn of any risk in the Investment, and Vallas further never warned of risk in the Investment.

236.   Defendants never warned the Plaintiffs that they could lose their entire Investment, that different companies Plaintiffs were unaware of would benefit from the Investment, that Vallas would use shell companies such as West Indies Trading to personally benefit, and that the Plaintiffs would never receive proper accountings or updates on their Investment.

237.   Plaintiffs have been damaged by Defendants' fraud in the amount of their lost Investment and/or the profits they should have earned in addition to the principal of their Investment.

238.   Defendants' conduct was done intentionally and willfully with the purpose and design to defraud Plaintiffs. Defendants knew that their conduct would cause Plaintiffs great financial harm. Defendants' conduct was wanton, willful and completely

Singh,
Singh &
Trauben,
LLP

devoid of any legitimate purpose. Left unchecked, Defendants will seek to defraud and cause harm to others. As a result, Plaintiffs are entitled to award of punitive damages to both punish Defendants and to dissuade them from engaging in similar wrongful conduct in the future all in amount subject to proof at trial.

239. Further, the nature of this ongoing fraud compels the remedy of a receivership, as Vallas and his alter ego companies cannot be entrusted to continue to operate the Business and account to Plaintiffs. A receiver should be appointed by the Court to operate the Business and account to Plaintiffs. Plaintiffs have clear ownership and property rights in the Business and its revenues, and without a receiver, there is a clear and present danger of Plaintiff's ownership rights, property and funds being lost, destroyed or misappropriated and in fact Plaintiff's rights and property are currently and on an ongoing basis being lost, destroyed and misappropriated.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### *(Against Defendant Vallas)*

240. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

241. Defendant Vallas was, at all times relevant, the majority or controlling shareholder and member of A.K.S. Corp., A.K.S. LLC, West Indies Trading and the Business.

242. Plaintiffs are and were at all times relevant a minority limited owners or minority members of A.K.S. Corp. and the Business.

243. Defendant Vallas owed minority owners and members such as Plaintiffs a fiduciary duty, which includes, but is not limited to, protecting the interests of minority owners and members.

244. As the controlling shareholder and/or member, Vallas owed fiduciary duties of care, good faith, loyalty and honesty to Plaintiffs.

245. Vallas further owed a fiduciary duty to Plaintiffs to use his ability to control

COMPLAINT

Singh,
Singh &
Trauben,
LLP

A.K.S. Corp. in a fair, just and equitable manner, and not to use his power to control the corporate activities of the Business to benefit Vallas or his solely owned company West Indies Trading alone or in a manner detrimental to Plaintiffs.

246.   The fiduciary duties of loyalty and good faith owed by Vallas required him to act in good faith, including but not limited to, a duty not to use this power to control corporate activities of the Business to benefit himself alone or his company West Indies Trading or in any manner detrimental to the minority members and to exercise good faith and inherent fairness towards Plaintiffs as minority owners.

247.   Moreover, as the majority owner, Vallas owed a duty to Plaintiffs as a minority owner such that any use to which he put his power to control the company must benefit all owners proportionately and must not conflict with the proper conduct of the Business.

248.   Despite these clear duties, by the acts and courses of conduct alleged herein, Vallas has unfairly deprived Plaintiffs of their recognized and well-established rights as a limited minority owner of A.K.S Corp. by conducting the Conversion in a manner that deprived Plaintiffs of their ownership rights. As such, Vallas' actions as the majority owner of A.K.S. Corp. directly injured the Plaintiffs.

249.   Moreover, Vallas as the majority owner of the Business has used his undue influence to loot the Business for his own benefit and unjustly enrich himself at the expense of Plaintiffs.

250.   In addition, Plaintiffs' rights as minority owners have likewise been denied, including, but not limited to, the right to inspect and copy all partnership or company records, the right to the accounting of or access to the books and records of the Business, including the books and records of A.K.S. Corp. and/or A.K.S. LLC, and the right to receive their share of the revenues derived from the Business, all of which have appeared to have been transferred to Vallas or third-party entities under his control including West Indies Trading.

251.   Further, Vallas used and continue to use the Business's assets, including

COMPLAINT

Singh,
Singh &
Trauben,
LLP

those of A.K.S. Corp. and A.K.S. LLC, for his own personal use and has wrongfully diverted and continue to divert monies belonging to A.K.S. Corp. and A.K.S. LLC and/or the Business and rightfully owed to Plaintiffs.

252.   By virtue of Vallas' looting, misappropriation and conversion of A.K.S. Corp., A.K.S. LLC and the Business' assets and revenues, Vallas has significantly reduced the amount of revenues and profits to be shared with Plaintiffs.

253.   Vallas' acts and omissions described above violated and continue to violate the reasonable expectations of the Plaintiffs as minority owners of the Business (through A.K.S. Corp. and/or A.K.S. LLC) and constitute burdensome, harsh and wrongful conduct demonstrating a complete lack of fair dealing in the affairs of A.K.S. Corp. and A.K.S. LLC and/or the Business, all to the prejudice and detriment of Plaintiffs.

254.   Vallas' misconduct constitutes intentional acts done for the purpose of depriving Plaintiffs of their share of the profits and distributions from the Business, and further constitutes fraud, oppression and malice so as to justify an award of exemplary and punitive damages.

255.   The acts of Vallas constitute oppression toward Plaintiffs.

256.   Disgorgement of profits is proper where, as here, it would be reasonably necessary to protect the minority owners' rights and interests. Specifically, it would be reasonably necessary where the majority owner has effectively oppressed the minority owners under the guise of management and/or where partner, company and/or assets of the Business are being misapplied, looted or wasted.

257.   As set forth above, Vallas has unfairly and unlawfully frozen out the minority owners, Plaintiffs through the Conversion, and his looting, and Vallas continues to comingle his assets with A.K.S. Corp., A.K.S. LLC and/or the Business and thereafter use that capital pool for his own personal dealings.

258.   As such, it would be reasonably necessary to disgorge the profits of the Vallas and A.K.S. Corp. and A.K.S. LLC to protect Plaintiffs' rights and interests in A.K.S. Corp. and A.K.S. LLC and/or the Business.

Singh,
Singh &
Trauben,
LLP

259.   As a direct and proximate result of Vallas' breaches of his fiduciary duties of loyalty and good faith owed to Plaintiffs, Plaintiffs have suffered damage in an amount to be proved at trial, but in no event less than $500,000.00, plus all profits Plaintiffs are entitled to, plus interest.

260.   Further, the nature of these ongoing breaches of fiduciary duty compel the remedy of a receivership, as Vallas and his alter ego companies cannot be entrusted to continue to operate the Business and account to Plaintiffs. A receiver should be appointed by the Court to operate the Business and account to Plaintiffs. Plaintiffs have clear ownership and property rights in the Business and its revenues, and without a receiver, there is a clear and present danger of Plaintiff's ownership rights, property and funds being lost, destroyed or misappropriated and in fact Plaintiff's rights and property are currently and on an ongoing basis being lost, destroyed and misappropriated.

<u>**COUNT VI**</u>
<u>**BREACH OF AGREEMENT**</u>
***(Against all Defendants)***

261.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

262.   Plaintiffs have performed all of the conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of each of the Hampton Subscription Agreement, Skyline Subscription Agreement, Huberman Subscription Agreement, Windward Subscription Agreement, Terepka Subscription Agreement and Carasso Subscription Agreement (collectively the "Subscription Agreements"), by, namely, timely making the Investments.

263.   Nonetheless, Defendants have completely failed and/or refused to perform their obligations in accordance with the Subscription Agreements.

264.   In direct contravention of the Subscription Agreements and Cal. Corp. Code § 416, Defendants have failed to provide any stock certificate(s) signed in the name of the corporation or other cognizable security or ownership interest in return for his

Singh,
Singh &
Trauben,
LLP

investment, and refused to provide any accounting or make any payment of any kind in return on the investment.

265.   Specifically, to date, and despite numerous requests, Defendants have failed and/or refused to provide Plaintiffs with or full access to Defendants' records and books of account, further refusing to allow Plaintiffs access to the actual books and financial records for the Business.

266.   Moreover, Defendants, and each of them, have improperly disbursed and/or improperly authorized the disbursement of Defendants' funds and/or profits to themselves, failing and/or refusing to properly disburse to Plaintiffs their contractual portion of all such Business revenues.

267.   Defendants, without the knowledge or prior authorization of any of the Plaintiffs, also converted A.K.S. Corp. to the limited liability company A.K.S. LLC without offering any membership interest in A.K.S. LLC to Plaintiffs to intentionally deprive Plaintiffs of their ownership interests.

268.   To date, Defendants have failed to fully disburse all monies due and owing to Plaintiffs in connection with the Subscription Agreements.

269.   To date, the Defendants, and each of them, have failed to provide any documents to Plaintiffs evidencing the conveyance of Plaintiffs' respective ownership interests in A.K.S. Corp. and the Business, as mandated under the Subscription Agreements.

270.   As a direct and proximate result of Defendants' material and continuing breaches of Plaintiffs' rights under the Subscription Agreements related to their minority interest in the Business, Plaintiffs have been damaged in an amount no less than the $500,000.00 Investment, plus all profits Plaintiffs are entitled to, pre-judgment interest at the statutory rate.

271.   Further, the nature of these ongoing breaches of the agreements compel the remedy of a receivership, as Vallas and his alter ego companies cannot be entrusted to continue to operate the Business and account to Plaintiffs. A receiver should be

Singh,
Singh &
Trauben,
LLP

appointed by the Court to operate the Business and account to Plaintiffs. Plaintiffs have clear ownership and property rights in the Business and its revenues, and without a receiver, there is a clear and present danger of Plaintiff's ownership rights, property and funds being lost, destroyed or misappropriated and in fact Plaintiff's rights and property are currently and on an ongoing basis being lost, destroyed and misappropriated.

**COUNT VII**
**ACCOUNTING**
*(Against all Defendants)*

272.  Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

273.  In exchange for the Investment, Plaintiffs were to receive an ownership interest in the Business including the right to receive a proportionate amount of the profits derived from all aspects of the Business.

274.  Plaintiffs never received any of the above at any time.

275.  This relationship allows for an appropriate claim for accounting to be made by Plaintiffs.

276.  In addition, as minority owners of the Business, Plaintiffs' rights would be significantly prejudiced absent an accounting of the Business' books and records, including all their financial ledgers and financial statements from 2017 to the present.

277.  As Defendants' obligations owed to Plaintiffs involve, among other things, a duty to account for all income, revenues and profits earned or received by the Business, and Defendants continue to fail and/or refuse to provide any such accountings or statements to Plaintiffs, it is not clear that the remedy at law would be as full, adequate, and expeditious as it is in equity.

278.  Due to Defendants' fraudulent and unlawful conduct in concealing and mismanaging the Business' finances, as well as Defendants' persistently oppressive and unfair actions against Plaintiffs, a proper determination of the Businesses' total assets and total monies owed to Plaintiffs arising from Plaintiffs' status as minority owners

would not be possible without an accounting.

279.   Upon information and belief, Defendants have received, and continue to receive, significant profits and revenues in connection with the Business.

280.   Defendants have and continue to receive revenues and profits, a portion of which is due to Plaintiffs.

281.   Plaintiffs have been denied their share of revenues and profits in the Business and have suffered substantial injuries alleged herein.

282.   The amount of money owed to Plaintiffs is unknown and cannot be ascertained without an accounting

## PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing, Plaintiffs respectfully requests that this Court enter a final judgment in Plaintiffs' favor and as against Defendants as follows:

1.   For an appointment of a receiver under the control and supervision of the Court to oversee the Business and to preserve and manage Plaintiffs' rights, properties, funds and ownership interests therein;

2.   For an order of rescission and restitution of all monies Plaintiffs transferred to Defendants in an amount no less than the $500,000.00 Investment;

3.   For an award of not less than the $500,000.00 Investment and/or profits from the Business in proportion to Plaintiffs' respective ownership interests as economic damages according to proof;

4.   For an award of not less than the $500,000.00 Investment and/or profits from the Business in proportion to Plaintiffs' respective ownership interests as for general damages according to proof;

5.   For consequential damages according to proof;

6.   For special damages according to proof;

7.   For punitive damages according to proof;

8.   For prejudgment interest at the legal rate of 10% to the date of judgment according to proof;

COMPLAINT

Singh,
Singh &
Trauben,
LLP

9.  For an order that Plaintiffs are entitled to a full accounting of all assets, liabilities income and expenses of the Business and for an accounting of all profits and income rightfully belonging to Plaintiffs;

10. For attorneys' fees allowed by law; and

11. For costs of suit according to proof.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

**DATED:** October 30, 2019                    Respectfully submitted,

**SINGH, SINGH & TRAUBEN, LLP**
**THOMAS K. RICHARDS**

By: _____
        THOMAS K. RICHARDS

*Attorneys for Plaintiff*
WINDWARD LOOP, LLC, MIKE TEREPKA,
DREAM HAMPTON, SEAN CARASSO,
SKYLINE CAPITAL PARTNERS, LLC
AND ERIK HUBERMAN